IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAUN ANTHONY VICTORIA,<br><br>             Petitioner,<br><br>vs.<br><br>WILLIAM MUNIZ, Acting Warden,<br>Salinas Valley State Prison,[1]<br><br>             Respondent. | No. 2:13-cv-02119-JKS<br><br>MEMORANDUM DECISION |

Shaun Anthony Victoria, a state prisoner proceeding *pro se*, filed a Petition for Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Victoria is currently in the custody of the California Department of Corrections and Rehabilitation and is incarcerated at Salinas Valley State Prison. Respondent has answered. Victoria has not replied.

I. BACKGROUND/PRIOR PROCEEDINGS

In resolving his claims on direct appeal, the Court of Appeal recounted the facts of this case as follows:

> The now deceased victim, Rodney Scaife, was [Victoria's] constant companion, who even travelled with [Victoria] on his long-haul trucking trips. Scaife received treatment at the emergency room for stab wounds to his torso and right arm in August 2005. The wounds were life threatening, and if untreated could have been fatal. He spent four days at the hospital before being released. At the time of his admission, he told a nurse that his roommate attacked him in the shower and stabbed him. He also told this to a residential security guard, who had found him lying outside and called 911. He later died in Arkansas in September 2009, when a car struck him as he was standing outside a vehicle after a crash.

---

[1]    William Muniz, Acting Warden, Salinas Valley State Prison, is substituted for R.T.C. Grounds, former Warden. FED. R. CIV. P. 25(d).

-1-

There are several accounts of how the 2005 stabbing came about.  We will list them in turn.  Additional facts pertinent to the arguments on appeal will be incorporated in the Discussion.

### A. *[Victoria's] Sacramento Girlfriend: Two Versions*

*Testimony*

[Victoria's] Sacramento girlfriend, Megan R. (Megan or the Sacramento girlfriend), and [Victoria] began dating in April 2004.  In August 2005, they had an argument that escalated into physical violence; [Victoria] struck Megan with his fist and a tool before falling asleep on her sofa.  Scaife, who had been outside during the fight between [Victoria] and Megan, attempted to comfort Megan in her bedroom.  He told her she should break off her relationship with [Victoria], then tried to kiss her.  She rebuffed him and he left the room.

The next morning, Megan told [Victoria] he had to take his belongings and leave her apartment.  When she got home that evening after midnight, [Victoria] came up to her as she got out of her car, knelt down, and begged forgiveness.  She invited him to come inside and talk for a few minutes.

Scaife entered Megan's apartment about a half-hour into their conversation, and asked if he could shower.  When Scaife left to get a bag out of [Victoria's] car, Megan told [Victoria] about Scaife's attempt to kiss her the previous night.  [Victoria] seemed visibly angry; he grabbed his cell phone and his cigarettes and went outside.  He brushed past Scaife as Scaife was coming back in.

Scaife came out of the bathroom naked and asked for towels.  Megan, unsure of [Victoria's] location, called him and told him what Scaife had done.  Almost immediately, [Victoria] came back into the apartment "really angry" and walked toward the kitchen mumbling that he could not believe it.  He grabbed a knife from the counter knife block and walked quickly toward the bathroom.

[Victoria] opened the bathroom door and pulled back the shower curtain.  From the sofa, Megan could see [Victoria] make punching motions at Scaife, and then she saw blood.  She never saw Scaife holding the knife.  Scaife grabbed for his clothes and fled the apartment, [Victoria] following him with knife in hand.

Megan was standing there still in shock when [Victoria] returned after a few minutes.  He dropped a mesh shirt into the sink, and told Megan to get her things because they were leaving.  As they drove off in her car, she could see the apartment complex's security guard kneeling over Scaife, who was lying on the walkway.  They headed to her grandfather's vacant home to spend the night.

While there, [Victoria] called two or three women.  Megan heard him tell one of them that he had stabbed Scaife because he had tried to rape Megan.  [Victoria] also told Megan that they would need to agree on an account of what happened.  After formulating several different versions, he eventually instructed Megan to tell the police that Scaife had tried to rape her; that when [Victoria] confronted him, Scaife had pulled a knife on him (that he already had with him in the bathroom); and that Scaife was stabbed as [Victoria] struggled for control of the knife.

-2-

They went to a hospital where Megan's mother worked (after telling her that they were on their way). [Victoria] had wanted to talk to Megan's mother before going to the police, because he had a good relationship with her. The mother arrived at the hospital already in the company of the police, who then arrested [Victoria].

*Extrajudicial Statements*

In her statement to the police, Megan initially adhered to [Victoria's] version of the incident. She claimed Scaife had tried to rape her two nights earlier. He had taken a knife into the bathroom on the night of the stabbing because he was afraid she would tell [Victoria] what had happened. When [Victoria] confronted Scaife after Megan had told him about the attempted rape, the stabbing occurred in the course of attempting to disarm Scaife, who fell onto the knife in the struggle.

As the detective continued to question Megan aggressively, she became afraid that he was not believing this story, so she told the truth as reflected in her testimony. She nonetheless repeated [Victoria's] version to the attorney she had hired to represent him initially, because she was afraid that [Victoria] would be released from jail before trial.[FN1]

> FN1. [Victoria's] attorney testified that in her interview with Megan, she had attested to the truth of the initial version in the police interview, and had changed the story only under pressure from the detective.

### B. *The Redding Girlfriend: More Fuel for the Fire*

[Victoria] had started dating a girlfriend in Redding, Amy W. (Amy or the Redding girlfriend), in October 2003; he moved into her Redding home in September 2004. By February 2005, [Victoria] started bringing Scaife home fairly often. Amy did not like this and thought Scaife was "creepy and scary" because he had often grabbed at her, and once pushed her onto a bed and invited her to have sex as he lay atop her. She had not told [Victoria] about these incidents. But this was one of the reasons she asked [Victoria] to move out of her Redding home in the spring of 2005. Scaife had started telling Amy unsavory things about [Victoria] behind his back, including that [Victoria] had started dating the Sacramento girlfriend and would be moving in with her (contrary to what [Victoria] had said to Amy).

On the night of the stabbing in August 2005, [Victoria] called Amy after learning about Scaife's attempt to kiss the Sacramento girlfriend. Amy then told [Victoria] about Scaife's backstabbing remarks. [Victoria] told her he was going to go inside and take care of matters, but he did not sound upset.

### C. *Scaife's Extrajudicial Versions*

*Corroborating [Victoria]*

An inmate testified he had known Scaife for two years preceding the stabbing. He encountered Scaife when both were in a holding cell at the jail, in what he thought (mistakenly) was the spring of 2005. Scaife asked him to deliver a note to [Victoria], who was awaiting trial on the stabbing. Scaife wanted [Victoria] to know that he would

-3-

not be testifying against him. Scaife explained to the inmate that he had exposed his genitals to Megan ([Victoria's] Sacramento girlfriend) in the bedroom while holding a knife with the intent of having sex. When she rebuffed him and said [Victoria] would be angry, he took the knife with him to the bathroom. He scuffled with [Victoria] in the bathroom while trying to stab him, and fell onto the knife after dropping it.

[Victoria's] initial attorney had also interviewed Scaife in the county jail in August 2005. Scaife admitted taking a knife into the bathroom to protect himself because he knew that defendant would be upset, and said that he had been stabbed in the struggle for the knife.[FN2]

> FN2. Both of these statements (along with the next two recorded phone calls) were the subject of a limiting instruction, restricting their substantive use to the corroboration of Scaife's statements to the nurse and the security guard that we mentioned above (except to the extent they resulted in adoptive admissions on [Victoria's] part). . . .

*Noncorroborating*

The prosecutor introduced a recording and transcript of a pretrial phone call between the jailed [Victoria] and a female friend. These involved messages left on [Victoria's] voice mail, which the female friend played for him during the phone call via the speaker on her cell phone. Several of these messages were from Scaife. He denied threatening any of [Victoria's] female acquaintances, as they had apparently reported. He claimed credit for having saved [Victoria's] life when he woke him up while driving the truck, which [Victoria] had failed to take into consideration in their confrontation. (In response to this remark, [Victoria] commented aloud, "Well, save me from going to jail now.") Scaife complained that no one else had ever put him in the hospital, and that [Victoria] had gone too far. Scaife asserted that he was not going to press charges, and asked that in return [Victoria] help him get back to Tennessee when he got out of the hospital (for which reason he wanted [Victoria] to retrieve his belongings). Scaife denied being naked in front of Megan and questioned why someone (presumably the Redding girlfriend) had delayed telling [Victoria] something (presumably about Scaife's badmouthing) until the night of the incident. Scaife promised that he had not talked to anyone about the incident and would not "do anything," and urged [Victoria] to get himself out of trouble.

The prosecutor also introduced a recording and transcript of a phone call the next day from [Victoria] to Scaife at the hospital, via a three-way call with the female friend. Scaife stated that he had declined [Victoria's] offer of help at the scene of the stabbing because [Victoria] was still holding the knife as he followed Scaife. [Victoria] reminded him that their conversation could be recorded. Scaife noted that he told the police he had not decided whether he would testify against [Victoria], and asserted that the police could not pursue [Victoria] without his cooperation. [Victoria] said he had given a version of the stabbing to the police in which they had been wrestling over the knife when Scaife fell on it. Scaife asked, "And they bought that?" [Victoria] replied that they had not; "You're going [to] have to corroborate it." Scaife agreed he could do that. [Victoria]

-4-

promised that he would then get Scaife back to Tennessee as Scaife had requested in the voice mail messages. Scaife expressed concern about Megan having claimed that he had sexually assaulted her. [Victoria] assured him that it was not something about which to be concerned. When Scaife asked why the stabbing happened if [Victoria] considered him a brother, [Victoria] reminded him not to discuss the matter on the phone and promised to talk to him about it when he was released. Scaife was shocked to learn that he had told the police before passing out that [Victoria] had stabbed him. Scaife noted that he had spoken already to the female friend who set up the call and said, "I did tell her what maybe if you could maybe say it go down like this." Scaife also reiterated his intention to disappear before any trial, saying "They can't do nothing to you without me being there."

### D. *[Victoria's] Versions*

*Testimony*

  [Victoria] testified Scaife had a habit of making passes at [his] "lady friends," and on the night of the stabbing [Victoria] had learned this was true with Megan as well. This did not greatly upset him because he had only a casual relationship with this girlfriend (his relationship with the Redding girlfriend was still ongoing) and he was "immune" by now to Scaife's behavior in this regard. His conversation with the Redding girlfriend did not have any effect on him, because he already knew about some of Scaife's badmouthing.

  After [Victoria] went calmly into the bathroom to ask Scaife about his behavior, Scaife brandished the knife at him as [Victoria] turned to leave. They struggled for possession of the weapon ([Victoria] punching Scaife as well), and Scaife fell onto it once (incurring multiple stab wounds). [Victoria] ordered Scaife to leave. He chased Scaife, who carried the knife with him, out of the apartment. Scaife dropped the knife on the pathway along with a mesh shirt. [Victoria] picked these items up and put them in the kitchen sink when he returned to the apartment.

*Extrajudicial Statements*

  In addition to [Victoria's] statements in the recorded phone conversation with Scaife, he had made statements in his conversation from jail with the female friend on the day before. He had asked her to go to the hospital and talk with Scaife. He claimed Scaife's refusal to talk was the reason [he] was still in jail, because Scaife had initially identified [Victoria] as the stabber, so Scaife now needed to talk to the investigating detective and exculpate [Victoria] with the version that they had wrestled over a knife and Scaife fell on it. In return, [Victoria] would make sure Scaife got to Tennessee. [Victoria] also suggested the female friend mention that his women acquaintances would file complaints about Scaife threatening them if he did not do this.

  The Sacramento girlfriend continued to talk with [Victoria] while he was in jail awaiting trial. During one of her visits, he held up a note that asked her to claim *she* had stabbed Scaife. The jailers seized the note, which was an exhibit at trial along with a note Megan wrote in response. [Victoria] acknowledged the note he had shown Megan

-5-

>during her jailhouse visit with him.  He said that it was merely a sarcastic response to her false statements to the police.

*People v. Victoria*, No. C065482, 2012 WL 1453547, at *1-4 (Cal. Ct. App. Apr. 27, 2012).

A jury convicted Victoria of attempted murder and assault with a deadly weapon, in the course of which he personally used a deadly weapon and inflicted great bodily injury.  *Id*. at *1.  The trial court thereafter sustained two recidivist allegations.  *Id.*  It imposed a state prison term of 25 years to life plus 9 years for the enhancements, with conduct credits limited to 15 percent of actual presentence custody.  *Id.*

Victoria filed a counseled appeal, arguing that: 1) the trial court abused its discretion in allowing the prosecution to introduce evidence of his prior bad acts; 2) the trial court erred in failing to instruct the jury on attempted voluntary manslaughter based on imperfect self-defense; 3) the trial court erred in failing to *sua sponte* instruct the jury on the lesser included offense of attempted voluntary manslaughter based on sudden quarrel/heat of passion; 4) the trial court erred in failing to *sua sponte* instruct the jury on the defense of accident or misfortune; and 5) the trial court violated his substantial rights in instructing the jury that it could consider Scaife's statements to a fellow inmate, Reginald Blount, only to the extent that they affected the believability of Scaife's other statements and not as substantive evidence.  The Court of Appeal affirmed Victoria's judgment of conviction in a reasoned opinion on April 27, 2012.  *Id*. at *8.  Victoria raised the same claims in his petition for review.  The California Supreme Court summarily denied review on July 11, 2012.  Victoria did not file any petitions for habeas relief in the state courts.  He filed his *pro se* Petition with this Court on October 9, 2013, and Respondent does not contest the timeliness of the Petition.

## II. GROUNDS RAISED

In his Petition before this Court, Victoria raises the same claims he unsuccessfully raised on direct appeal. First, he argues that the trial court erred in failing to *sua sponte* instruct the jury on the lesser included offense of attempted voluntary manslaughter based on sudden quarrel/heat of passion. Second, he argues that the trial court erred in failing to instruct the jury on attempted voluntary manslaughter based on imperfect self-defense. Third, Victoria argues that the trial court erred in failing to *sua sponte* instruct the jury on the defense of accident or misfortune. Fourth, he claims that the trial court violated his substantial rights in instructing the jury that it could consider Scaife's statements to a fellow inmate, Reginald Blount, only to the extent that they affected the believability of Scaife's other statements and not as substantive evidence. Fifth, and finally, Victoria argues that the trial court abused its discretion in allowing the prosecutor to introduce evidence of his prior bad acts.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is "contrary" to federal law "if the state court applies a rule that contradicts the governing law set forth" in controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the


Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Victoria has not replied to Respondent's answer. The relevant statute provides that "[t]he allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true." 28 U.S.C. § 2248; *see also Carlson v. Landon*, 342 U.S. 524, 530 (1952). Where, as here, there is no traverse filed and no evidence

offered to contradict the allegations of the return, the court must accept those allegations as true. *See Phillips v. Pitchess*, 451 F.2d 913, 919 (9th Cir. 1971).

## IV. DISCUSSION

Evidence of prior bad acts

Victoria first argues that the trial court abused its discretion in allowing the prosecutor to introduce evidence of his prior bad acts. Victoria raised this claim on direct appeal, and the trial court summarized the background of this claim as follows:

> In July 1991, [Victoria] was convicted of rape and forcible oral copulation in concert. He and two codefendants had sexually assaulted a friend's girlfriend in her home, and robbed her afterward.
> The prosecutor moved to admit the evidence of these two convictions for impeachment purposes in the event [Victoria] testified. On learning [Victoria] intended to testify, the court granted the motion but limited the evidence to the bare fact of two prior felony convictions. The court cautioned defense counsel, however, that "if any doors are opened to violence, then [the nature of those offenses] may become relevant."
> During redirect examination, [Victoria] asserted that he had a problem with Scaife only when the latter had been drinking (which he believed Scaife had been doing on the night of the stabbing). There would be a personality change, which [Victoria] described as "evil, screaming . . . , his judgment just out of the window completely. . . . " He also described a previous scuffle between them, when [Victoria] was driving the inebriated Scaife home and he grabbed at the steering wheel. This led to a pushing and yelling match.
> The prosecutor then argued this testimony regarding Scaife's character and [Victoria's] portrayal of him as the aggressor made [Victoria's] aggressive character relevant and moved to admit the prior convictions as evidence of [Victoria's] character for violence. Although defense counsel argued the priors were too remote, the prosecutor pointed out that [Victoria] had been in prison for most of the intervening period. The trial court granted the motion; however, it limited the additional evidence to the fact that the prior convictions involved force. In response to the prosecutor's question, [Victoria] acknowledged the forcible nature of the priors.

*Victoria*, 2012 WL 1453547, at *4.

The court ultimately denied Victoria relief, concluding that, under state law, the trial court did not err in admitting the nature of Victoria's two prior convictions:

>        [Victoria] agrees that a defendant who introduces evidence of a victim's character for violence (in support of a theory of self-defense from a victim's act of aggression) forfeits the statutory protection against introduction of character evidence to establish the defendant's propensity for violence. (Evid. Code, §§ 1101, subd. (a), 1103, subd. (b); *see People v. Walton* (1996) 42 Cal. App. 4th 1004, 1014.) [Victoria] argues, however, that his testimony did not establish Scaife had a *violent* character when drunk. Rather, he had testified only that Scaife was a "belligerent" drunk. He asserts the trial court consequently erred at the foundational level in allowing the introduction of the forcible nature of his prior convictions into evidence, abusing its discretion as a matter of law.
>        [Victoria] cites *People v. Blanco* (1992) 10 Cal. App. 4th 1167, 1172 (*Blanco*). The case is not instructive, however. It holds only that it is constitutionally permissible for the statute to allow "certain types of character evidence in rebuttal, only after [a] defendant first raises the issue by presenting evidence of the victim's character in order to prove [a] . . . reasonable response to alleged provocation or attack." (*Blanco,* at p. 1175.) The case does not, however, at any point purport to define the *type* of character evidence of a victim that comes within the statute and triggers the prosecution's entitlement to introduce rebuttal evidence, and thus its mere employment of the term "violence" in describing the narrow reach of the statute (*id.* at p. 1172) cannot be construed as a holding that limits the statute only to that type of character evidence.
>        [Victoria] is engaging in hairsplitting. He has not demonstrated that "evidence [of a] victim['s] . . . character for violence or a trait of character tending to show violence" (Evid. Code, § 1103, subd. (b)) connotes any peculiar meaning for "violence" as a term of art. The concern of the statute is evidence of character to support a defendant's claim that the victim was *an aggressor* to whom the defendant responded with acts of self-defense. (*E.g.*, *People v. Moreno* (2011) 192 Cal. App. 4th 692, 702 [defendant entitled to discover evidence indicating victim had "propensity for violence *or aggressive behavior*" (italics added)]; *Engstrom v. Superior Court* (1971) 20 Cal. App. 3d 240, 245 [same; "specific *acts of aggression*" (italics added)]; *Blanco, supra,* 10 Cal. App. 4th at pp. 1173-1175 [discussing derivation of rule behind Evid. Code, § 1103, subd. (b)]; *see People v. Thomas* (1969) 269 Cal. App. 2d 327, 329 [in proof of self-defense, would be entitled to introduce evidence of "specific acts *of prior belligerence*" (italics added)]; 2 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) Character, Habit, and Custom, § 33.5, p. 1195 [proper to submit evidence of fights in which victim was aggressor to prove victim was aggressor in fight with defendant].) [Victoria's] evidence in the present case was of this tenor: The victim was a belligerent drunk; [Victoria] asserted his belief the victim had been drinking; and, therefore, the victim was the one to wield the knife, not [Victoria]. That satisfied the necessary foundation for admission of the forcible nature of [Victoria's] prior convictions. As a result, the trial court did not err in admitting the nature of the prior convictions.

*Id*. at \*5.

The Supreme Court has acknowledged its "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts." *Crane v. Kentucky*, 476 U.S. 683, 689 (1986). The Supreme Court has further made clear that federal habeas power does not allow granting relief on the basis of a belief that the state trial court incorrectly interpreted the state evidence code in ruling on the admissibility of evidence. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). On direct appeal, the appellate court determined that, in line with the California Evidence Code and state case law, the trial court properly allowed into evidence the nature of Victoria's two prior convictions. This Court is bound by the state court's interpretation of California state law. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

Moreover, the United State Supreme Court has left open the question of whether state law would violate the Due Process Clause if it permitted the use of prior crimes evidence to show propensity to commit a charged crime. *Estelle*, 502 U.S. at 75 n.5 ("[W]e express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime."); *Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008). As such, the Ninth Circuit has routinely found federal habeas relief to be foreclosed by § 2254(d)(1) for claims challenging the admission of evidence of prior bad acts or crimes. *See, e.g., Larson v. Palmateer*, 515 F.3d 1057, 1066 (9th Cir. 2008); *Alberni v. McDaniel*, 458 F.3d 860, 866 (9th Cir. 2006).

Finally, Victoria's suggestion that counsel was ineffective in failing to object to the evidence is without merit. The evidence was clearly admissible under state law, and counsel will

not be deemed ineffective for failing to raise a meritless objection. *See Sexton v. Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012) ("Counsel is not necessarily ineffective for failing to raise even a nonfrivolous claim, so clearly we cannot hold counsel ineffective for failing to raise a claim that is meritless." (internal citation omitted)); *see also Lockhart v. Fretwell*, 506 U.S. 364, 374 (1993) (O'Connor, J., concurring) (failing to raise a meritless objection cannot constitute prejudice under a *Strickland* ineffective assistance of counsel claim). Victoria therefore cannot prevail on his claims that the evidence was erroneously admitted or that counsel was ineffective in failing to object to its admission.

Instructional errors

Victoria next raises four instructional error claims. A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990). The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment. *Francis v. Franklin*, 471 U.S. 307, 309 (1985). This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

It is well established that not only must the challenged instruction be erroneous but it must violate some constitutional right, and it may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at

72. This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn. *Id.* at 72-73. "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation." *Id*. Where the defect is the failure to give an instruction, the burden is even heavier because an omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates the law. *See Kibbe*, 431 U.S. at 155. In those cases, the inquiry is whether the trial court's refusal to give the requested instruction "so infected the entire trial that the resulting conviction violates due process." *See id.* at 156-57; *Estelle*, 502 U.S. at 72.

   1.   Failure to instruct on manslaughter as a lesser included offense

Victoria argues that the trial court erred in failing to *sua sponte* instruct the jury on manslaughter because there was substantial evidence that he actually but unreasonably believed in the need for an attempt to resort to deadly force in his own defense. He similarly asserts that the trial court erred in failing to *sua sponte* instruct the jury on attempted manslaughter because there was evidence that he acted in the heat of passion. The Court of Appeal rejected these contentions on direct appeal, concluding that the evidence did not warrant such instructions. *Victoria*, 2012 WL 1453547, at *6-7.

The United States Supreme Court has held that the failure to instruct on a lesser included offense in a capital case is constitutional error if there was evidence to support the instruction. *Beck v. Alabama*, 447 U.S. 625, 638 (1980). The Supreme Court, however, has not decided whether to extend this rationale to non-capital cases. The Ninth Circuit, like several other

federal circuits, has declined to extend *Beck* to find constitutional error arising from the failure to instruct on a lesser included offense in a non-capital case. *See Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000); *Windham v. Merkle*, 163 F.3d 1092, 1106 (9th Cir. 1998) ("[T]he failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question."); *James v. Reese*, 546 F.2d 325, 327 (9th Cir. 1976) ("Failure of a state court to instruct on a lesser offense fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding."). Accordingly, the decision of the Court of Appeal denying Victoria relief on this claim was not contrary to United States Supreme Court authority as set forth in *Beck*.

Nevertheless, the Ninth Circuit has recognized that "the refusal by a court to instruct a jury on lesser included offenses, when those offenses are consistent with defendant's theory of the case, may constitute a cognizable habeas claim" under clearly established United States Supreme Court precedent. *Solis*, 219 F.3d at 929. Victoria, however, did not argue at trial that he acted in self-defense or in the heat of passion. Victoria claimed that Scaife fell on the knife after Victoria calmly broached the subject of Scaife's conduct toward his girlfriends. Victoria thus denied that he acted intentionally, much less in self-defense or as a result of provocation. Because an instruction on manslaughter based on heat of passion or unreasonable self-defense was not consistent with Victoria's defense and was not supported by the evidence, no due process violation arose from the failure to instruct the jury on the lesser included offense. *See Bradley v. Duncan*, 315 F.3d 1091, 1098-1101 (9th Cir. 2002) (finding federal due process violation where defendant's request for instruction on the only theory of defense was denied); *Solis*, 219 F.3d at 929. He therefore cannot prevail on this claim either.

2.      Failure to *sua sponte* instruct on the defense of accident

Again, Victoria's major claim at trial was that Scaife's knife wounds were accidental.  He thus argues that the trial court violated its *sua sponte* duty to instruct on the "defense" of accident.  Victoria acknowledged on direct appeal that he was not entitled to relief on this claim under state law, but requested to preserve the claim for federal habeas review:

> Several days before [Victoria] filed his opening brief, *People v. Anderson* (2011) 51 Cal. 4th 989 held that "accident" is only a variation on a defense theory that a defendant lacked intent, and thus constitutes a "pinpoint" instruction on which a court has a duty to instruct *only on request.* (*Id.* at pp. 996-997.)  Defendant acknowledges in his reply brief that we are bound to reject his argument as a matter of state law.  He therefore simply asks to preserve the issue for possible federal review.

*Victoria*, 2012 WL 1453547, at *7.

Victoria's claim is tenuous because he failed to request an instruction on the defense of accident at trial.  *See Kibbe*, 431 U.S. at 154 ("Orderly procedure requires that the respective adversaries' views as to how the jury should be instructed be presented to the trial judge in time to enable him to deliver an accurate charge and to minimize the risk of committing reversible error.  It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." (footnotes omitted)).  Victoria must therefore establish that the failure to give the pinpoint instruction "so infected the entire trial that the resulting conviction violates due process."  *Id.* (quoting *Cupp*, 414 U.S. at 147).

As already discussed, under Ninth Circuit authority, a criminal defendant is entitled to have the court instruct the jury on his theory of defense, provided it is supported by law and has foundation in the evidence.  *See Solis*, 219 F.3d at 929.  However, "it is *not* reversible error to reject a defendant's proposed instruction on his theory of the case if other instructions, in their entirety, adequately cover that defense theory."  *Duckett v. Godinez,* 67 F.3d 734, 743 (9th Cir.

1995) (quotation omitted).  Moreover, even where a trial court errs in instructing the jury, habeas relief will be granted only where a petitioner establishes that the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamsom,* 507 U.S. 619, 637 (1993).

The jury in Victoria's case was instructed that in order to find him guilty of attempted murder, the People must prove that he intended to kill Scaife, and that in order to find him guilty of assault with a deadly weapon, the People must prove that he acted willfully.  The jury was further instructed that with respect to both charges, there must be a union of the act and wrongful intent.  When viewed as a whole, the instructions conveyed to the jurors that if they found that Victoria did not have the requisite state of mind, which necessarily included consideration of Victoria's defense of accident, they could not find him guilty of those charges.  Clearly the jury did not accept Victoria's accident defense for the crimes; thus, even if an accident or misfortune instruction had been given, the verdict would have been the same.  Victoria has therefore failed to demonstrate that the absence of the pinpoint instruction had a substantial or injurious effect or influence in determining the jury's verdict.  *See Dawson v. Harrington*, No. C 09-783, 2010 WL 5387699, at *7 (N.D. Cal. Dec. 20, 2010); *Auten v. Gomez*, 162 F.3d 1167, 1167 (9th Cir. 1998) (unpublished disposition).

     3.    Limiting instruction

Finally, Victoria argues that the trial court erred in giving a modified version of CALCRIM No. 319, which instructed the jury that the Scaife's extrajudicial statements to an inmate, Reginald Blount, could not be considered as substantive evidence, and that trial counsel

was ineffective for failing to object to the instruction. Victoria raised this claim on direct appeal, and the Court of Appeal denied him relief:

> With the assent of defense counsel (who admitted he could not draft a superior version), the trial court instructed the jury on use of Scaife's various extrajudicial statements as follows: "[The victim] did not testify in this trial, but you heard testimony as to statements he made to [the security guard] and [the nurse] as well as statements that were made by [the victim] on a 911 call recording [*sic;* these appear to be the *security guard* repeating his statements, not the victim himself]. You may use those statements as proof that the information contained in them is true. [¶] You have also heard evidence that [the victim] made other statements to [the inmate, Reginald Blount], [the initial defense attorney,] and to [Victoria] on the recorded jail phone calls. If you conclude that [the victim] made those [latter] statements, then you may consider them only in a limited way. You may use them only in deciding whether to believe the [former] statements. . . . You may not use those [latter] statements . . . as [substantive] evidence . . . [or] for any other reason, unless the following exception applies . . . [:] [¶] . . . [Y]ou [may] consider the statements made by [the victim] to [Victoria] on the jail phone call recordings as [substantive] evidence . . . if you believe [the victim's] statements resulted in an adoptive admission by [Victoria]," then referencing a separate instruction on adoptive admissions.
> 
> [Victoria] concedes the principle underlying the instruction is correct. He contends, however, that Scaife's statements to the inmate should *not* have been limited to corroborative use because they were statements against penal interest (Evid. Code, § 1230) and therefore admissible substantive evidence.
> 
> We will not break down the various components of the hearsay remarks to which the inmate testified and determine which were and were not statements against penal interest.[FN4] The other recordings made clear that by the time Scaife encountered the inmate, Scaife had already discussed with [Victoria] his intent and motive to fabricate an exculpatory account of the stabbing. This vitiates *any* aura of trustworthiness, which is necessary for their admission. (*People v. Duarte* (2000) 24 Cal. 4th 603, 614-615, 617-618.) We are also convinced beyond a reasonable doubt that the admission as substantive evidence of yet another version of the circumstances of the stabbing would not have changed the outcome of the trial.
>
>> FN4. The inmate testified Scaife admitted he had exposed himself to Megan, had taken the knife into the bathroom out of fear of [Victoria's] reaction if she told him, and had fallen on the knife after trying to stab [Victoria]. (*See* pp. 6-7, *ante.*)

*Victoria*, 2012 WL 1453547, at *7-8.

Claims of error in state jury instructions are generally a matter of state law that do not usually invoke a constitutional question. *Gilmore v. Taylor*, 508 U.S. 333, 342-43 (1993).

-17-

"Claims that merely challenge the correctness of jury instructions under state law cannot reasonably be construed to allege a deprivation of federal rights." *Van Pilon v. Reed*, 799 F.2d 1332, 1342 (9th Cir. 1986); *see also Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005) ("Any error in the state court's determination of whether state law allowed for an instruction . . . cannot form the basis for federal habeas relief."); *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988) (an instructional error "does not alone raise a ground cognizable in a federal habeas corpus proceeding"). Thus, to the extent that Victoria contends that the limiting instruction violated state law, such claim is not cognizable on federal habeas review. On direct appeal, the appellate court determined that, in line with the California Evidence Code and state case law, Scaife's statements to the inmate were inadmissible. This Court is bound by the state court's interpretation of California state law that the statements were inadmissible. *Bradshaw*, 546 U.S. at 76; *Horton v. Mayle*, 408 F.3d 570, 576 (9th Cir. 2005) ("If a state law issue must be decided in order to decide a federal habeas claim, the state's construction of its own law is binding on the federal court.").

Furthermore, even if the limiting instruction was erroneous, it was harmless. *Brecht*, 507 U.S. at 637-38. The evidence that Victoria stabbed Scaife was overwhelming, and thus, even if the jury had been permitted to consider the inmate's statement that Scaife claimed to have incurred multiple stab wounds after falling on a knife, it is not likely that the jury would have acquitted Victoria. Among other things, the security guard who tended to Scaife after the incident testified that Scaife said that Victoria stabbed him. Scaife also told the nurse who admitted him into the hospital that his roomate had stabbed him. Megan, Victoria's Sacramento girlfriend, witnessed most of the incident, and testified that Victoria was "really angry" after she

told him that Scaife had just exposed himself to her, and she saw Victoria grab a knife from the kitchen, walk into the bathroom where Scaife was drying off after his shower, and attack Scaife. She covered her face during part of the attack, but then saw Victoria exit the bathroom, still holding the knife. Scaife was still in the shower, and blood was "everywhere." Victoria later attempted to enlist Megan into covering up the incident, which is further evidence of his consciousness of guilt. He first told Megan to tell the police that Scaife attempted to rape her, that Scaife pulled a knife on Victoria in the bathroom, and that Victoria was merely attempting to take the knife away from Scaife when Scaife was stabbed. Megan testified that, after Victoria heard that Scaife would be cooperating with law enforcement, Victoria asked her to take the blame for stabbing Scaife. Finally, the three-way phone calls, in which Scaife confronted Victoria about the attack and agreed to lie to the police on his behalf in exchange for help in getting back to Tennessee, were admitted into evidence. Given the evidence against Victoria, it is not reasonably likely that, even if all of the inmate's statements had been admitted for the truth of the matter asserted, that the results of the proceeding would have been different. Victoria therefore cannot prevail on any of his claims.

## V. CONCLUSION AND ORDER

Victoria is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree

with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals. *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: December 15, 2014.

         /s/James K. Singleton, Jr.
         JAMES K. SINGLETON, JR.
         Senior United States District Judge